It appearing, to the satisfaction of the Court, from the report of the clerk, that EDWARD GRAHAM HAYWOOD, one of the attorneys of the Court, had, as attorney for Mrs. Martha Kane, received the sum of $4,496.22, and from the affidavit of Mrs. Kane, that he had after repeated solicitations, failed to account for and pay the same over to her:
On motion of Moore Gatling and Phillips Merrimon, attorneys for Mrs. Kane, a rule was granted in the first named case on Col. Haywood to pay the said balance of $4,496.22 into Court.
This rule was made returnable on the 4th day of January, 1872.
At the return of this rule, Col. Haywood filed in Court the following answer thereto: *Page 4 
In the matter of MARTHA KANE.
The respondent answering the rule herein, for answer thereunto, says:
That sometime about the close of the year 1867, or the beginning of the year 1868, Mrs. Martha Kane called on this affiant, at his law office in the city of Raleigh, and represented to him, that she was one of the heirs at law and next of kin to John Kane, deceased — was poor and helpless, resided in Ireland, and desired this affiant to act for her in obtaining possession and reducing to money her share of the said John Kane's real estate and personal property, and upon hearing her statement and questioning her, this affiant thought it probable that her statements were true and that she had legal rights, and undertook to investigate the rights further. Upon further investigation this affiant became satisfied that she had legal rights, and about the month of March, 1868, she having confessed her inability to pay this affiant a retaining fee, he took from herself and her husband, Thomas Kane, the power of attorney, bearing date February 6th, 1868, and herewith filed, whereby he, this affiant, became the agent and attorney in law and fact of the said Martha and Thomas, to receive the said Martha's share of the real and personal estate of John Kane, deceased, reduce the same to possession and account with them for three fourth's the value thereof, with powers also to supply such attorneys under him as he should see fit to conduct such business, and upon the receipt of this power of attorney, this affiant agreed to become, and did become, such agent and attorney in law and fact of the said Martha and Thomas, as is therein set forth and described.
This affiant avers that all moneys, property and estate, real and personal, which has come into his possession or under his control, for and in behalf of the said Martha and Thomas, have so come into his possession and under his control, in and by virtue of said instrument. *Page 5 
After collecting evidence of the marriage of said Martha and Thomas, of the naturalization of the said Thomas, and taking numerous ex parte
depositions to ascertain the genealogy of the Kane family, and to find out who were the next of kin and heirs at law of John Kane, deceased, and to identify the said Thomas Kane with the Thomas Kane, whose naturalization we were prepared to prove, which evidence had to be collected in Ireland, New York State, New Jersey and elsewhere, the collection of which consumed some eight or ten months and required a very extensive, laborious and voluminous correspondence, and to aid in which the said Martha, at the suggestion of this affiant had retained and used the services of Moody B. Smith, Esq., counsellor and attorney at law, resident in New York City, this affiant supposed he would have been able to assert the said Martha and Thomas' rights, and to obtain possession of the money, property, and estate to which they were entitled, without suit, but the administrators of John Kane insisted that they had exhausted his personal estate in the payment of debts, except as much thereof as had been lost by the recent civil war or had perished or been destroyed by other inevitable accidents, and the persons in the possession of the real estate of which John Kane, died seized and possessed, and which consisted of town lots in the city of Raleigh, and an undivided moiety of a plantation near Raleigh, in Wake county, refused to acknowledge the said Martha's rights.
The persons, who by their tenants under them, were in possession of the town lots in the city of Raleigh, claiming them as their own, were two infants, by name Francis Patrick McCarthey and Isabella McCarthey, and the mother of the said infants, by name Mary McCarthey, wife of Dennis McCarthey, claimed the same; also, asserting that she was a sister and heir at law of John Kane, deceased, and though born in Ireland and married to an Irishman, her husband had been naturalized after their intermarriage and before the death of the said John *Page 6 
Kane. The undivided moiety of John Kane, deceased, in the aforesaid plantation near Raleigh, had been sold under a license obtained from the Court of Pleas and Quarter Sessions of Wake county, by the administrators of John Kane, deceased, on a petition filed by them against Francis, Patrick and Isabella McCarthey, as the sole heirs at law of John Kane, deceased, for assets to pay debts and the said moiety was in the possession of the purchaser at said sales.
About the month of October, 1868, this affiant, without further consultation with the said Martha and Thomas, and claiming the right so to do under the aforesaid power of attorney, instituted a civil action, in the Superior Court of Wake county, in the name of the said Thomas and Martha Kane as plaintiffs, against the said Patrick Isabella McCarthey, infants, and Dennis McCarthey and Mary, his wife, as defendants, to recover possession of the said Martha's share of the aforesaid town lots in the city of Raleigh, and to effect a division of the same among the parties entitled thereto, according to their respective rights which said action was eventually carried by appeal into this Court, where at January Term 1869, it was held that the said Martha, as one of the heirs at law of John Kane, deceased, was entitled to an undivided moiety, of and in said town lots, and the said Mary McCarthy was entitled to the other undivided moiety, and by consent of the parties interested therein, it was adjudged that the said lots should be sold by the Clerk of the Supreme Court, and the proceeds equally divided between the said Martha Kane and Mary McCarthey, which sale was accordingly made, as directed, by the said clerk. The Court further decreed that the defendants, Francis, Patrick and Isabella McCarthey, should account for the rents and profits of said town lots which they had received since about the year 1866, and by an arrangement entered into, between, this affiant and the counsel for the defendants, the amount of said rents was ascertained by consent, and the rents and profits and proceeds of sale of town lots were carried into one common account *Page 7 
and fund, and the respective rights of the parties in said fund were ascertained by consent — the share of the said Mary McCarthey being charged with the amount of rents and profits, which had been received and consumed by her children, Francis, Patrick and Isabella, all which will more fully and at large appear by reference to the proceedings in said action, now on file in this Court, and here referred to, for greater certainty.
Of this joint fund, consisting of the rents and profits and the proceeds of the sale of the said town lots, this affiant received in the aggregate, $9,902 30 in various payments, made from time to time, between the 2nd of April, 1869, and the 18th of March, 1870, by the Clerk of the Supreme Court to this affiant, as representative of the said Martha and Thomas Kane, under and by virtue of the power of attorney aforesaid, which this affiant exhibited to the said clerk when he first began to draw the said fund, and left with said clerk a memorandum of the volumes and page of the book in the office of Register of Deeds in said county of Wake, wherein said power of attorney was registered: of this aggregate sum of $9,902.30, so received by this affiant as aforesaid, from the Clerk of the Supreme Court, about $2,543.98 was paid to this defendant in cash, and about $7,358.32 in well secured notes of individuals, which had been given to said clerk for the purchase money of said town lots, and were transferred by him to this affiant, which said notes this affiant collected and reduced to money, by virtue of his authority under the said power of attorney, and this affiant has never received any other money for the said Thomas and Martha Kane, or either of them, and he received this sum not because he was attorney of Record for the plaintiff in the aforementioned actions of Thomas Kane, and wife Martha, plaintiffs, against Dennis McCarthey, and wife Mary and others, defendants, but under and by virtue of the power of attorney aforesaid.
Of this sum so received by this affiant, he held $2,475.57 1/2 as his own by the terms of the said power of attorney, and *Page 8 
was accountable to the relative, Martha Kane and her husband Thomas Kane, for the remaining three-fourths of said sum only.
On account of this remaining three-fourths he paid out the following accounts on behalf of the said Thomas and Martha, 1869, May the 28th, on or about this date, to J. N. Bunting, Clerk of the Superior Court of Wake county for Court costs, $32.65.
May the 31st. On or about this date, he purchased from the State National Bank, of Raleigh, N.C. a check on the Bank of the Republic, N.Y., (No. 3621) for six hundred dollars, which he transmitted to the said Martha Kane, then in New York, and for which this affiant paid $601.50.
July the 18th, 1870. On or about this date he paid to Judge Warren, Moody B. Smith's draft on him, this affiant, for services rendered to the said Martha Kane by the said Smith, as her counsel in New York, and which the said Martha had agreed should be paid out of her fund when collected by this affiant — amount $1,000.
August 29th. On or about this date, he paid the joint draft of the said Thomas and Martha Kane on him for $1,000.
September 24th. On or about this date, he paid a similar draft on him for $1,000. All these amounts were paid in cash, and this affiant files herewith his vouchers for said disbursements.
Since the said Martha has been in the United States, during her present visit to this country, and according to this affiant's recollection, sometime during the last of the Summer or the first of the Autumn of the year 1871, she has drawn drafts upon this affiant to the amount of $2,000, in two drafts of $1,000 each, in favor of some banking house in the city of Newark, N. J., the name of which this affiant cannot now recall, which drafts this affiant has accepted on account of the fund received under said power of attorney, and which he believes are now outstanding in the hands of said banking house. This affiant objected to accepting said drafts, because *Page 9 
they were not signed by Thomas Kane, the husband of said Martha, as well as herself, and the said Martha had no evidence of his authority to produce, to justify said drafts, but he finally consented to accept the same; this affiant cannot state with certainty the dates when said acceptances fell due; one of them he thinks fell due in October, and the other in November, last past, and this affiant admits that he failed to pay the said acceptances at maturity, only because of the failure to receive funds which he had expected to have in hand in apt time for that purpose, but he has been informed by the said Martha, since her arrival in this city in November, last past, that she has raised money on said acceptances, and that they are now outstanding in the hands of the aforesaid banking house, in Newark, as a security for money on said acceptances, and that they are now outstanding in the hands of the aforesaid banking house in Newark, as a security for money advanced to her.
This affiant has already mentioned the undivided moiety of a small plantation in Wake county, near the city of Raleigh, of which John Kane, died, seized and possessed, and which had been sold by the administrators of said John for assets, before the said Martha Kane's right as one of his heirs at law was established. After the decisions of the aforementioned actions of Kane and wife, vs. McCarthy and wife, and others, in the Supreme Court, this affiant succeeded in obtaining a surrender of possession of said real estate from the purchaser thereof, and in setting aside the sale which had been made of said undivided moiety, the said Martha Kane's share of said moiety still remains in specie and has never been disposed of by this affiant under his aforesaid powers of attorney, and this affiant cannot say certainly what is its value, but according to the best of this affiant's recollection, when the whole of said moiety was sold as aforesaid for assets, it brought about $2,800 or $3,000 on said sale, and this affiant insists that in any settlement he may have with the said Thomas and Martha Kane, he is entitled to a credit of one-fourth of the value of the said *Page 10 
Martha Kane's interest in said plantation near Raleigh, according to the terms of the aforesaid power of attorney.
This affiant further says, that the said John Kane, died, about May of the year 1863, and after his death, as this affiant has been informed and believes, it was supposed for a time, that he left no heirs at law who could inherit his real estate in North Carolina, and the same was taken into the possession of the Trustees of the University of North Carolina as having escheated, and the said public corporation received the rents and profits of said real estate, for three or four years, and is liable to account to the said Martha Kane for one-half the value of said rents, c., for the said three or four years. The value of this claim, which is admitted, has never been ascertained, the said corporation not yet having been in a condition to discharge the same, but this affiant insists that in any settlement he may have with the said Thomas and Martha Kane, he is entitled to a credit of one-fourth of the value of said claims according to the terms of his aforesaid power of attorney.
This affiant further says, that he has been informed and believes, that the said John Kane, was at the time of his decease, possessed of a very considerable personal property, consisting of slaves, household and kitchen furniture, bar fixtures, and the necessary furniture for carrying on an eating-house, some old family plate farming utensils, gold and silver coin, which he had stored away before and during the first part of the late civil war, and bonds, notes, accounts due him. That the same, upon his decease, went into the possession and under the control of his administrator, to wit: Patrick Donnaghey and John Whitelaw, and that they have eloigned and wasted the same; that after extended search, this affiant has failed to find the administration bond, filed by said administrators, in the Court of Pleas and Quarter sessions of Wake county — many of the papers in the office of the Clerk of Wake county Court having been misplaced and destroyed, about the time when the *Page 11 
city of Raleigh was occupied by the U.S. army, in the Spring of 1865. That the minutes of Wake County Court were so ill kept in 1863, and the entry therein of the names of the sureties on the said administration bond, is so much defaced and so imperfect, that this affiant has not been willing to rely upon it to bring a suit upon said bond, to receive the distributive share of the said Martha Kane, as one of the next of kin of John Kane, deceased. That moreover, there are several claimants who assert that they are creditors of said John Kane, to large amounts, and were residents beyond the Confederate lines at the time of John's decease, and have therefore remained unpaid, and it has been understood between this affiant and several members of the Bar, resident in Raleigh, who hold said alleged claims for collection, that a suit or suits should be instituted by them to ascertain whether said claims could be established and collected without subjecting any funds or real estate, which this affiant held as the agent of the said Martha Kane, to their payment, in consequence of all these circumstances and others of less moment, this affiant has heretofore failed to ascertain the distributive share of Martha Kane, in the assets of John Kane, deceased, and to collect the same, but he believes the value of said distributive share is very considerable, and he has great hope that it may be eventually reduced to possession. This affiant has carefully examined into the whole matter, and while he cannot state the probable value of said interest and claim, he insists he is entitled to a credit of one-fourth of said value, in any general and final settlement he may have with said Thomas and Martha Kane, under and by virtue of his power of attorney aforesaid.
This affiant further says, that when he took the said power of attorney from the said Thomas and Martha Kane, as is herein set forth, the one-fourth part of the funds, property and estate, which it is therein provided, this affiant is to retain for his own use, was regarded and considered by the parties to said *Page 12 
instrument, as his compensation for his general agency and management in their affairs in the matters therein set forth. And it was expressly understood and agreed if suits arose in the conduct of their business, this affiant was to be at liberty to pay counsellor's and attorney's fees in said suits, with the funds of the said Thomas and Martha Kane — accordingly when this affiant found it necessary to bring the action herein before referred to, and which was ultimately decided in the Supreme Court, he concluded to conduct such suit himself, he being very familiar with the facts of the case, and avoid the expense of sub-counsel, and when he wrote the result of said trial, to the said Thomas and Martha, after the decision of the Supreme Court therein was known, the said Thomas wrote to this affiant in reply, expressly agreeing that the amount of his remuneration for legal services was not to be limited by the one-fourth specified in the power of attorney, and this affiant hath herewith filed the said letter of the said Thomas, bearing date May 22d 1869, and he insists that the amount of said additional compensation, must be ascertained and allowed in the settlement with the said Thomas and Martha Kane.
This affiant further says, that from the time when he first began to act as the general agent of the said Thomas and Martha Kane, under his aforesaid power of attorney, it was understood and agreed, by and between himself and the said Thomas and Martha, that he was to retain a considerable portion of their funds in his hands, until all matters connected with his said agency were completed, and from time to time as they needed it, they were to draw upon him for money and that no final settlement was to be had between them, until the end of his said agency; while suits were existing or imminent or impending, it was considered necessary for the full and effectual performance of his duties as their said agent and attorney, in fact, that he should have money of theirs in his hands, and this affiant insists that upon a fair and just settlement of accounts between him and the said Thomas and *Page 13 
Martha, taking into consideration the various matters herein before set out, and the agreements and understandings aforesaid, a very small balance, if any, would be found in favor of the said Thomas and Martha, over and above his own outstanding acceptances for $1,000 each, herein before more particularly described.
This affiant further says, that it is not true as stated in the affidavit of Martha Kane upon which the rule against him herein is based, that has repeatedly promised to account with the said Martha Kane for his receipts under said power of attorney and therein disappointed her; that on the contrary no demand has ever been made upon him for an account and settlement by the said Thomas and Martha Kane, or either of them, except as is hereinafter set forth. That this affiant had never heard any complaint from the said Martha and Thomas, or either of them, on account of his manner of managing their affairs or for his want of promptness in forwarding their money, until after his failure to meet the two drafts of $1,000 each, hereinbefore more particularly described, when he received a letter from the said Martha, then in Brooklyn, asking him to make arrangement, and pay said drafts — which letter, bearing date November 8th, 1871 he herewith files — as well as another letter from her, bearing date October 16th, 1871.
The next information he had of the said Martha, was about the 27th of November, 1871, when he learned from a member of his family that she had arrived on the Northern train, driven at once in the omnibus from the cars, to his residence, and left word for this affiant that she was in Raleigh and desired to see him. This affiant was not at home when she called as aforesaid, about dark in the evening. The Circuit Court of the United States was then in session in this city, upon which it was absolutely necessary for this affiant to be in attendance, both at its morning and afternoon sessions, in the performance of his professional duties, but as soon as he learned she was in Raleigh, he inquired of the omnibus driver that very night *Page 14 
where she was stopping, and sent a message to her early the next morning, making an appointment with her at his office, that very day, for about the hour of the adjournment of the Circuit Court in the forenoon, between 1 and 2 o'clock, P. M, at which time he met the said Martha, in accordance with said appointment. In this interview the said Martha stated to this affiant that her object in visiting Raleigh was to make arrangements for the payment of one of said acceptances for $1,000. She stated the difficulties of her position substantially, as set forth in her letters and affidavit. She did not call upon this affiant for a general account and settlement; on the contrary she stated that she did not desire any such account and settlement until all her business under the said power of attorney was finished, when a general one could be had, and in the meantime, that this affiant was at liberty to continue to use her funds. She further stated, she only desired this affiant to make arrangements to protect her said drafts of $1,000 each, and if not both of them, then the payment of one was all that she desired — that all other matters were to remain over until the business was concluded and for a general settlement at this affiant's convenience, when his agency was terminated. In this interview the said Martha did not even ask this affiant to give her a general idea of the balance in his hands in her favor, or to let her know the general condition and state of accounts between them.
This affiant stated to her, that when he accepted her drafts he expected to meet them promptly, but that he had been disappointed in the receipt of money that he expected to receive in time; that he even yet hoped for the arrival of funds within the next eight or ten days, (as was the fact), and if he was fortunate enough to get them he would pay one or both of said drafts. He stated to the said Martha, that during the time her funds were in his hands, and when he was receiving the same from time to time, he had lost large sums of money by the default of himself, or of others, amounting in the *Page 15 
aggregate to $25,000 or thereabouts; that he was greatly pressed himself and embarrassed in his pecuniary affairs; that he had not under his control in cash even so small a sum as $20, to provide for the daily wants of his large family, but he would do his very uttermost to relieve her from her embarrassing position, and this affiant avers that all his statements made to the said Martha as aforesaid, were true, and he has strained every nerve to raise money for her, as was indeed his duty under the circumstances, but he has hitherto failed of any success in his endeavors.
This affiant told the said Martha, that it would have been better for her to have warned him beforehand, by letter, of her coming to America to collect money from him, so that he might have had some opportunity to prepare for her. Whereupon she stated that the collection of money from this affiant was not the purpose or object of her visit to America. That she had come over to this country for the purpose of seeing a sick relative in Newark, N. J., whom she had learned was likely to die, and while here had concluded to draw the aforesaid drafts on this affiant.
This affiant assured her he would do his best in her behalf, whether she was here, in Newark, or in Ireland; that as she had stated to him, she was at heavy expenses in boarding, perhaps it would be better for her to return to her friends in Newark — that if this interview were prolonged for hours, or repeated daily for twenty times, he had dealt with her frankly, and could say, do and promise no more than he had already done. But she expressed a desire to wait in Raleigh eight or ten days, to ascertain what this affiant could do for her in the premises, at the end of which time she would again call upon him. This affiant stated to her that the United States Circuit Court was in session, he was obliged to be in attendance there daily, but if, she desired to meet him at any time, she had only to send a message to his house to that effect, and he would always manage to fix some time in the recess, for that purpose. *Page 16 
On parting, the said Martha asked this affiant to furnish her with a note to her landlord, Marx Schloss, stating he would be responsible for her board, which this affiant promised to do, and accordingly during that evening, this affiant wrote such a note and sent it to the said Martha early next morning, wherein he informed said Schloss that he, this affiant, was the agent of the said Martha, had funds of hers in his hands, and would promptly honor any drafts the said Martha might draw upon him in favor of the said Schloss, for the amount of her board bills. This affiant further says, that the said Martha Kane gave him no previous warning of her intended trip to America, nor of her coming to Raleigh from Brooklyn or Newark, on account of the non-payment of the aforesaid draft, and since the interview last herein before described, in which this affiant was polite, deferential, kind and respectful to her, expressing the deepest sympathy for her circumstances, and the most profound regret for his inability to meet said drafts at maturity, all of which he felt, he has never seen her, nor had any communication from her, except as herein after set forth.
Within a day or two after said interview, early in the day, while this affiant was in his bed-room, undressed, and while he was hurrying his dressing and breakfast, in order that he might get in time to the Circuit Court, which was still in session — a member of his family knocked at his door, and informed him Mrs. Kane had sent word from his office that she was there to see him. It was then after the usual Court hour, and this affiant being greatly hurried, and not being completely clad, was compelled to send her word that he could not see her then, but if she wanted to see him specially, to send or leave word at his house during the day, and he would inform her of an hour when he could see her at his office. This affiant heard no more from her, nor of any further efforts on her part to see him, and he had supposed she had left the city, until he learned to the contrary, after the rule in this *Page 17 
matter was served upon him, late in the afternoon of the 3rd of January, 1872.
This affiant therefore, says, it is not true as stated in the said Martha's affidavit, that he promised in the aforesaid interview with her, to pay her the balance of the $10,000 claimed by her, less $2,600, within ten days from that interview, nor is it true, as stated in said affidavit, "That even after said last mentioned interview, this affiant has refused to see or communicate with her, the said Martha, or to pay her any part of the money so in his hands for her, or to give her any satisfaction as to his purpose to settle with her and pay her."
This affiant further says, that on or about the 9th day of December 1861, he received through the post office, the letter which is herewith filed, bearing date December 7th, 1871, and signed by Messrs. B. F. Moore, and Phillips Merrimon, wherein the said gentlemen, as counsel for Mrs. Martha Kane, ask this affiant to favor them with an account of her affairs in his hands. This letter reached the affiant during the aforesaid session of the United States Circuit Court, when this affiant was daily occupied with his professional duties in said Court. He knew that a written statement, which would do justice to this affiant, would be laborious and voluminous, and would require a considerable search among his letters, papers and accounts, and it was impossible for this affiant to give his attention to the matter during the term of the said Court; accordingly this afflant [affiant], within a day or two after said letter was read, saw Judge Merrimon in Court, and stated as much to him, and promised to give him an answer to his letter, and request as soon as he was less pressed by business and attendance on Court, and this affiant understood Judge Merrimon to express his satisfaction with that arrangement.
The said term of the Circuit Court adjourned a day or two before Christmas — this affiant, was and continued, very unwell during Christmas week, and was entirely unfit for business in his office. On the 2nd day of January, 1872, a special term of *Page 18 
the Superior Court of Wake county, convened in Raleigh, and has been in session ever since, and this affiant has been compelled to give his time and attention to attendance on said Court, and performance of his professional duties connected therewith, and he only makes time now to reply to this rule by neglecting his duties to his clients in the said Superior Court of Wake county.
This affiant was therefore surprised, when, without further communication from the said Martha Kane, or any of her counsel, the rule in this matter was served upon him on the 3rd of January, 1872, at dark, while this affiant was within the bar of the Superior Court of Wake county, and actually engaged in arguing an important matter then pending before said Court.
And this affiant most solemnly avers, that he hath not now in his possession any funds belonging to the said Thomas and Martha Kane, or either of them, nor has he in his possession, or under his control, any property or estate, in which he has invested the same, or any part thereof; nor has he invested any of their, or either of their funds for his own use or benefit; no has he ever purposely, or knowingly, or wilfully, or corruptly appropriated to his own use or benefit, any portion of the moneys which came into his hands by virtue of his aforesaid power of attorney.
This affiant admits, that he ought to have funds of the said Thomas and Martha in his hands to meet the aforesaid drafts for $2,000, which he has accepted; and also to pay the balance, if any, which your Honors shall declare to be due them upon the statement of the general accounts of debits and credits, between this affiant and the said Thomas and Martha, on account of his agency under his aforesaid power of attorney. But he avers that his failure to have said funds in hands, results partly from the frauds and mismanagement of other persons against which he could not guard, and partly from his own want of that care and diligence, which he ought to have *Page 19 
exercised, whereby he has lost and been deprived of said funds, and not at all from any corrupt misappropriations by him in his professional character, and as an officer of this Court, of the moneys which came into his hands for the said Thomas and Martha.
This affiant admits that he owes the said Thomas and Martha a debt that the debt is one against which he has most probably no legal defence; that it is one which every instinct of his professional honor prompts him to pay, and against which he would not even attempt a defence; but this affiant avers, that by a series of misfortunes, and a want of proper management, and care, and prudence in the conduct of his affairs, he has become utterly destitute; that he has not ready money in hand sufficient to pay for daily food for his wife and children; that all his visible property has been seized and sold under executions; that his law library has been sold for taxes; that he has nothing in his possession, but the clothing and wearing apparel of himself and family and a small supply of fuel, and no hope of a preservation from starvation, for himself and his wife and children except in the fees which he may hereafter derive from the exercise of his profession; and he has exercised and exhausted all his credit, tact, ingenuity, influence and skill in his efforts to raise funds to meet the aforesaid drafts for $2,000 — in vain. If your Honors should order him to pay any sum of money into Court for the use of the said Martha, this affiant's compliance with said order, would be a moral and physical impossibility; and this affiant denies that his indebtedness to the said Martha, originated in such circumstances of official misconduct and corrupt and criminal practice on his part as authorized proceedings against him, as for a contempt, summarily to compel him, to pay such debt to said Martha Kane by process of contempt.
This affiant will endeavor as succintly as he can, and if he have sufficient time before he is ruled, to answer the rule served upon him herein, to state in detail, the combination of *Page 20 
circumstances which has placed him in his present painful position, and rendered him unable to pay to the said Martha any balance of her funds, which your Honors may declare him liable for, and which ought to be in his hands.
At the close of the late war, in 1865, this affiant was entirely destitute of means, and owed a large amount of money to numerous individuals. He exerted all his power to make money to free himself from debt, and was eminently successful. He commenced discharging his debts rapidly; but in carrying out his plan of paying all as he could, he found himself annoyed, and hindered by the fact, that in some way it became known
whenever he made a deposit of any considerable amount with his bankers in Raleigh, and his creditors, who gained such information, became importunate. He therefore resolved to close his bank account, which he did, according to his best recollection, in the latter part of 1867, and kept such money as he acquired from time to time, and such as came into his hands for others in his own possession, about his own person and in own house and office, in one common fund, which, for some months, did not amount at any one time, to any very large sum. Towards the Fall of 1869, this affiant had paid off all his pressing back debts, and had commenced to accumulate considerable sum of his own, being in large practice, had in his hands several thousand dollars belonging to his clients, among other moneys, he had some $2,000 or $3,000 of the Kane fund in hand, he cannot say with absolute certainty how much.
Before the war, this affiant had been in the habit of keeping a deposit account for some nine years in New York City, in the banks of New York, principally because by means of checks, on such account, he was enabled to more conveniently transmit, collected money, to his clients. About August and September, 1869, he determined to open a similar account with a banking house of reputation in New York City, and for a similar purpose. This affiant was then in the possession of a large amount of cash of his own, and some belonging to others. *Page 21 
His professional income in cash alone for the months of July, August and September, 1869, reached about $8,750.
This affiant made arrangements by which, at about this period, he placed near $10,000 to his credit in New York, and on this fund he relied to pay his then indebtedness to Mrs. Martha Kane and others, it being much more than sufficient for that purpose. He had about the same amount, even more, in ready money or drafts, equal to cash, in his hands in North Carolina. Under such circumstances he did not take any special pains to keep each separate fund in his hands distinct. He had much more than sufficient, on hand, to pay all when called upon.
Between the middle of September and the end of October, 1869, this affiant learned certainly, that his banker in New York had failed, and his $10,000 fund in that city, had ceased to be available for the purposes for which he had originated it. A bout this time, this affiant got in hand some $13,000 more of his own money. At a former period of his life, this affiant had been addicted to intemperance in the use of ardent spirits. Under the shock which this heavy loss gave him, after his hard struggle for many years, to free himself from debt, this affiant again fell into habits of hard drinking — he was rarely and only for short intervals, free from excessive intoxication; from the end of September, 1869, until the summer of the year last past. He had this large sum money in his hands, he received other large sums belonging to himself and others, during this period, especially about February, 1870; he had some $1,600 of the Kane funds, received in January of said Year, and about $3,700 more received in February of the same year. This affiant, for several months, about this time, was in a state of mad drunkenness. He had large sums of money about his person, his office and his house. He has never been able to ascertain what became of the large sums of money then in his hands; he is ignorant what he did with them; he is sure he was robbed of large sums; he was defrauded of some; he *Page 22 
must, in his drunken ignorance, have squandered some; he may have lost some; sometimes, when he would, to some extent, recover his reason, he could not but believe that in his hours of entire loss of recollection, he must have hidden his money away, and forgotten where he had put it, so entirely unable is he to account for his heavy deficit. This affiant's own income, and other services were, during this period, more than sufficient for his own wants and expenditures, and so far as his knowledge extends, he did never intentionally appropriate any of Mrs. Martha Kane's funds to his own use and purposes. After this affiant's loss of his deposits in New York, and during the period when he was receiving Mrs. Kane's funds, he had in hands in cash of his own, more than $25,000. The result of the whole matter has been, that he has lost large sums of his own, and has become indebted to Mrs. Martha Kane and is unable to pay her.
This affiant further says, that under the advice of his counsel, he has endeavored to answer fully and explicitly the rule herein, and to make the fullest and frankest disclosure of the whole matter involved therein to the Court. That his answer has necessarily been prepared in great haste, and under adverse circumstances; this Court has ruled him to a prompt reply, and this, during a time when this affiant was daily occupied in another Court, and has so been compelled to prepare his answer during the night hours for the most part, and when he was much exhausted by other labor, that he has been hurried in the examination of his papers, and has been in much mental distress during its preparation, so that it is possible he may have made some slips of memory in slight detail, but this affiant does not think he has, and he believes the whole of this affidavit and every detail thereof to be true.
ED. GRAHAM HAYWOOD.
Sworn, c. *Page 23 
The matter was then discussed by Messrs. B. F. Moore and Phillips in opposition to, and by Messrs. Fowle and Batchelor in support of the sufficiency of the answer.
[The briefs on file are inserted infra.]
The Court, after consideration, adjudged the return insufficient, and on motion, an order was made requiring Col. Haywood to show cause on the 29th day of January, 1872, why he should not be attached for contempt of the Court, by reason of his default in failing to pay in the money.
On the return day Col. Haywood filed an answer admitting that he had failed to pay in the money, averring his great anxiety to comply with the order, disclaiming any wilful disobedience thereto, setting forth substantially, that he had made every effort to comply; that he is entirely insolvent without credit, c.
On argument of this answer, it was suggested that Col. Haywood had, by his conduct, rendered himself subject to be disrobed, and the matter was left open and another rule granted in the matter of Ed. Graham Haywood, exparte, requiring him to show cause on the 3d day of February, why he should not be attached "or otherwise dealt with" for contempt, in failing to pay in the money, at which time Col. Haywood filed an answer, setting forth in substance that he is ignorant of what acts of his, touching the money transaction, are alleged to constitute a contempt of the Court; that he is advised that none of his acts, touching the money, amount to such misbehavior by him in an official transaction as constitutes a contempt of the Court; disclaimed intentional disrespect of the Court, or disregard of its authority, c., and refers to and adopts his two former answers. Thereupon, the two cases above stated were argued again by the same counsel who argued the first return.
Mrs. Kane invoked the power of the Court, as one of its suitors, to compel by process of attachment, E. G. Haywood, Esq., one of the attorneys of the Court to pay to her a large sum of money, to-wit: $4,496, ascertained by clerk's report, which he had received as her attorney of record, and on demand failed to pay.
A rule was therefore made, that said Haywood show cause, c. To this he put in a long and detailed answer, admitting that he had received the money and failed to pay it to Mrs Kane, but denying that he had applied it to his own use, and averring that the money had been lost; in what way he was unable to say, for he had been "mad drunk" during a period of eighteen months, and supposes that he burnt up the money by throwing it into the fire, or he may have put it away in *Page 28 
some secret place to keep himself from destroying it, and never has been able to find it.
This answer was deemed insufficient, and the respondent was put under a rule to pay the money into Court, or show cause why he should not be arrested. To this he answered that after making every effort to comply with the rule, it was out of his power to do so, he was totally insolvent, had nothing to support himself and his wife and children, could get no aid from his friends and relations and had no credit. That in failing to perform the order he intended no contempt of the Court and deeply regretted his inability to do justice to his client.
This answer was held by the Court to be sufficient. The respondent was not arrested and imprisoned, because the Court was satisfied, that it was not in his power to pay the money into Court. If a party is ordered to execute a deed and refuses to do it, he will be kept in jail until he executes the deed; for that is a thing which he can do. So, if an attorney, by false representations, procures his client for an inadequate consideration, to assign the cause of action, he will be put in jail and kept there until he executes a release and a re-assignment, but when a man is ordered to pay money into Court, and swears, that after every effort, it is out of his power to pay the money or any part of it, (in the absence of any suggestion to the contrary) that is an end of the proceeding, for the Court will not require an impossibility, or imprison a man perpetually for a debt, he having purged himself of the contempt.
After this rule was discharged, another rule was applied for by some of the members of the bar — that "E. G. Haywood be attached and further dealt with according to law," for matter set out in the prior proceedings: the rule was granted, and the matter has been fully discussed.
On the opening of the argument "In the matter of E. G. Haywood, exparte," the attorneys when requested by the Court, to state what further proceeding, was asked for, *Page 29 
demanded, "that said E. G. Haywood be disbarred and deprived of his license to practice as an attorney of the Courts in this State." We have been aided by full and able arguments on both sides of the question. But for the Act ratified 4th April. 1871, we should feel it our duty to disbar E. G. Haywood, and strike his name from the roll of attorneys at law.
So, the matter turns upon the construction and true meaning of the Act of 1871; sec. 4, is in these words: "no person who shall have been duly licensed to practice law as an attorney, shall be disbarred or deprived of his license and right so to practice law, either permanently or temporarily; unless he shall have been convicted or in open Court confessed himself guilty of some criminal offence, showing him to be unfit to be trusted in the discharge of the duties of his profession."
The words "convicted or in open Court confessed himself guilty of some criminal offence," have acquired a technical meaning, to convey the idea that the party has been convicted by a jury, or has in open Court, when charged upon an indictment, declined to take issue, by the plea "not guilty," and confessed himself guilty, and at the mercy of the Court. This is obvious by the sense in which these words are used in the section under consideration. The tenor of the whole act shows, that such was its purpose. The preamble sets out, that doubts have been expressed as to the construction of the Act of 1869, by reason of which the Judicial authority have asserted, that other acts of contempt, not specified in said act, still exist at the common law, and the Courts "have assumed to exercise jurisdiction over the same, and to impose other punishments therefor"
(to-wit, disbarring or striking from the roll).
The statute, then goes on with a manifest intention to restrict the power of the Judiciary, just as far as the Constitution permits the General Assembly to do, and confines the neglects and omissions of duty, malfeasance, c., ., to the specified particulars in the Act of 1869, and for fear of evasion *Page 30 
by the Courts, it is enacted; "if there be any parts of the common law now in force in this State, which recognize other acts, neglects, malfeasances,c., c., the same are hereby repealed and annulled.
Then comes section 4, by which it is enacted not that the attorney may be disbarred, if he be convicted of a contempt or if he confesses himself guilty in open Court, supposing a trial by the Court for a contempt, but "unless he shall have been convicted, or (shall have) confessed himself guilty in open Court of a criminal offence, using words in the past tense, and assuming a conviction to have been had by the verdict of a jury, or by confession in open Court when charged upon a bill of indictment. The purpose of the statute is so plain, that "he who runs may read."
Mr. Phillips argued that the word "convicted" is sometimes used in the sense of a conviction by the Court, and cited "Yates case," 6 Johnson, 338, and "Yates vs. Lansing, 9 Johnson, 396, in which the word "conviction" is used in that sense. But note, there the matter is spoken of as a conviction by the Court of a contempt, here it refers to a conviction of some criminaloffence, which can only be by the verdict of a jury or by confession, and note further, that if the section under consideration, means a conviction by the Court for a contempt, as was the course before, the statute effects no change in the law, and makes a great parade for no purpose.
Mr. Moore on the argument, gave it, as his opinion, that an attorney was guilty of a criminal offence as a misdemeanor, for "misbehaviour in any official transaction," and took the position that the respondent could be dealt with as one "who had confessed himself guilty of a criminal offence."
The same reasoning is applicable to this position, as we have used in reference to one who shall have been convicted of a criminal offence, with this additional consideration, the confession in this instance was not voluntary as when one charged upon a bill of indictment confesses his guilt in open Court; *Page 31 
but the respondent was forced to it; had he refused to answer on oath, he must have been imprisoned until he did so. Under these circumstances, to use his confessions as establishing guilt, would be in effect to compel him to criminate himself on oath.
For this kind of inquisitorial proceeding, there is no precedent in the Courts of any country, which enjoys the rights guaranteed by "magnacharta."
We declare our opinion to be, that the Act of 1871 takes from this Court its common law power, and that the Court now has no power to disbar an attorney, unless he shall have been convicted, (by a jury) or (shall have) in open Court confessed himself guilty of some criminal charge, showing him unfit to be trusted in the discharge of the duties of his profession.
The constitutionality of this statute, with certain savings in respectto the inherent rights of the Court, is settled by ex parte Schenck, 65 N.C.
253. This is not a direct contempt, within the savings made by that decision, but a constructive contempt, made so, by the common law to enable the Court to purge the bar of unworthy members. That common law right is taken away and the power of the Court is restricted to particular circumstances, after a conviction or confession upon indictment. We have no disposition to exceed the limits prescribed by that statute: the proceedings will be suspended, to the end that, this Court may take further action should it become necessary; however painful the duty may be, to order the name of one of its attorneys to be stricken from the roll, the Court will perform it, should the case be brought within the meaning of the statute, in such cases made and provided.
Its exercise was not asked for, but it was said on the argument, the Court had the power to punish the respondent, by fine and imprisonment, under section 2 of the Act of 1869, for misbehaviour as an attorney in an official transaction, under paragraph 8, section 1.
If it was clear, that the Court had the power to punish by fine and imprisonment for the mere sake of punishment, a *Page 32 constructive consequential contempt like that under consideration; it might be questioned, whether this Court, which was not created for the punishment of criminal offences, should, on mere motion, inflict the punishment, after the proceeding to disbar has been suspended, to await further preliminary steps, should any be had, in the Superior Court. There is no doubt that a party may be doubly dealt with, and sometimes trebly; for instance, if an attorney commits murder in the presence of the Court, he may instantly be fined and imprisoned for this direct contempt, he may be indicted, convicted and executed, and before execution his name may be struck from the roll, after the manner of the age of chivalry, when the spurs of a Knight attainted, were struck off before execution, to the end that the order might not be put under disrepute, by his suffering a disgraceful death while he was a Knight. But ours is a different case. The respondent as an attorney of the Court, received the money, is not able to account for it, and fails to pay it over to his client, but as there is no proof or admission that he wilfully and corruptly applied it to his own use, it is a clear case for disbaring at the common law, but if he is punished by imprisonment, at the end of thirty days he comes out of jail, and walks into Court entitled to all of the rights and privileges of one of its officers.
The question as to the power of the Court is not free from difficulty. If a man refuses to execute a deed when he is ordered to do so, imprisonment is a fit and proper remedy, so, if a man insults a Judge while on the bench, such punishment is fit and proper; but where there is a moral delinquency showing an attorney to be an unworthy member of the bar, then imprisonment is not an appropriate remedy for the evil.
In ex parte Moore 63 N.C. 397 and ex parte Biggs 64 N.C. 202, we had occasion to examine this subject fully, and our conclusion was, that as fine and imprisonment did not furnish a fit and proper remedy for the case of an attorney who by reason of moral delinquency or for other cause, had shown *Page 33 
himself to be an unworthy member of the profession, such cases were not provided for by the Act of 1869, nor that the common law power of the Court, could still be exerted.
The Act of 1871 takes from the Court this common law power to purge the bar of unfit members; except in specified cases, and it fails to provide any other power to be used in its place, it is a disabling and not an enabling statute; the whole purpose seeming to be, to tie the hands of the Court, so, when our power is taken away the Court is not at liberty to fall back upon another which it had before adjudged to be ineffectual to accomplish the end proposed; indeed the Court could not do so on mere motion, with a proper regard to its self-respect, and without evincing what might be justly considered, a pertinacious purpose, to press the matter ofcontempt, and if not allowed to do it in one way, to do it in another, however unfit the latter may be, to effect its purpose of preserving the purity of the legal profession.
PER CURIAM. Let the proceeding in the matter of E. G. Haywood be suspended. *Page 34