On the first day of the Term of said Court, his Honor made the following order, and had the same entered on the Minute Docket of said Court, to-wit:
"The Court being informed of a certain libellous publication directly tending to impair the respect due to the Hon. G. W. Logan, Judge of the Superior Court of the Ninth Judicial District of (354) the State of North Carolina, and to the authority of the Court, which appeared in the Daily Patriot, a newspaper published in the City of Washington, D.C., on the 25th of April last, and is headed "Letter *Page 272 
from North Carolina, Photograph of a Radical Judge, Lincolnton, N.C. April 21st, 1871, Hon. Francis Blair," etc., (a copy of which is spread upon the records,) purporting to be signed by D. Schenck, an Attorney of said Court.
It is therefore ordered by the Court that the said D. Schenck be disabled from hereafter appearing as an Attorney and Counsellor in said Court, unless he shall apply on Saturday, 13th May, inst., and show cause to the contrary.
It is further ordered, that a copy of this order be served on the said D. Schenck immediately with a copy of the aforesaid letter."
The letter referred to in the foregoing order, as taken from the records of said Court, is as follows:
"LETTER FROM NORTH CAROLINA.
"PHOTOGRAPH OF A RADICAL JUDGE,
"Lincolnton, N.C. April 21st, 1871.
"HON. FRANCIS BLAIR:
"Dear Sir: I write to inform you that the communication read by Senator Nye on the 13th from Judge (?) Logan, is a base and unmitigated falsehood, made out of the whole cloth to bear upon the Ku Klux bill. I, with the whole bar, attended Cleaveland Court. On Monday there was a rumor that on Biggerstaff, a pliant tool of Logan's, had been whipped by parties who retaliated upon him for shooting at his own brother, and endeavoring to assassinate him. There was no politics in it — purely a family feud; but Logan summoned 300 men, and had them armed and paraded around his house, and arrested some forty persons, not one of whom, as every one knows, had anything to do with it.
"At the same time he dispatched his man `Friday,' one (355) Carpenter, to report to Washington, and he remained at home and the report was circulated that he was afraid to leave home for Cleaveland Court. The citizens of Cleaveland at once held a public meeting, assuring him of protection, and sent their sheriff to escort him to Shelby. Mark his reply, `He was not at all afraid, but was staying to investigate the whipping, and that he would come when he got through.' Thus leaving Court and people to lose time and money, while he was doing magistrate's duty at home.
"The Solicitor, a republican, strongly denounced him, and wrote him an urgent letter to come. The very day that Senator Nye read Logan's *Page 273 
letter in the Senate, saying he, Logan, was afraid to come to Cleaveland, Logan came without escort or molestation, and held court as peacefully, if not more peacefully than every one was held before.
"This Logan is an ignorant, vile, corrupt man, whom no one respects, and for whom the whole bar have a sovereign contempt.
"Yours truly and gratefully,
"D. SCHENCK."
Upon the day mentioned for the return of said rule, and after service of notice thereof upon the said Attorney, he filed the following plea, verified by affidavit.
"GASTON COUNTY:
"In Superior Court,
"In the matter of David Schenck.
"This respondent having been served, on the 8th inst., with a copy of an order rendered by the court on that day, (here reciting the order mentioned heretofore,) now on this the 13th day of May, in open Court appears, and for cause to the contrary shows:
"1. That having been duly licensed to practice law as an Attorney of said Court, he has the lawful right to continue so to practice in said Court without restraint or impediments, for that he has (356) not been convicted, or in open Court confessed himself guilty of any criminal offence, showing him unfit to be trusted in the discharge of the duties of his profession according to the provisions of the statute in such case made and provided.
"2. This respondent affirms that he has never been convicted, or in open Court confessed himself guilty of any criminal offence, showing him to be unfit to be trusted in the discharge of his profession, and therefore denies, that this Court has the power to lawfully make the order temporarily disabling him from practicing his profession, and further denies that it has any jurisdiction in the premises to continue and enforce it.
"Wherefore he insists that said order be discharged, and respondent be permitted to exercise his right as an Attorney and Counsellor, agreeable to the Constitution and the laws of the land.
"D. SCHENCK."
Upon the coming in of the foregoing plea, and after argument of Counsel, his Honor was of opinion that no answer had been filed so as *Page 274 
to entitle respondent to be heard upon the rule, and ordered that said rule be made absolute, from which ruling the respondent prayed an appeal to the Supreme Court, which was declined by the Court, upon the ground that respondent had failed to answer the rule as required by the provisions of the statute of April 10th, 1869.
At the present term of this Court respondent filed a PETITION FOR Acertiorari, which was granted, and made returnable on 19th June.
The transcript having been returned to the effect above.
Moore, with whom were Gatling, Wilson, Bragg Strong, in behalf of respondent, argued as follows:
1. Unless the letter was written for publication, the Judge could not notice it as a contempt of Court. For there can be no (357) contempt of Court if the act be not so intended, unless the act be a contempt per se. Thus, to say to an intimate friend confidentially that a certain Judge is a felon, is not a contempt of the Court in which that Judge presides, although the friend should publish it. So, if a writer intending his composition for an after age, should lose it, and, without his consent it should get into the press, he is not responsible for the effects of its publication, no more than if the composition should be swept away by a tornado and be found and published in another kingdon. 2 Gr. Ev. sec. 414, 326.
2. The Judge had before him no legal evidence of even the writing of the letter by the defendant, much less of its publication by his consent. The printed name of the subscriber furnishes no evidence of the writer, unless it be shown that he has acquiesced in the charge of authorship. This may be done by showing that he has had notice of the publication, and has omitted, after opportunity to do so, to deny it. 2 Gr. Ev. sec. 416.
3. But conceding the publication to have been intended, it is no contempt of Court, under our law, though it were so at common law, because our statutes expressly forbid the Courts so to treat it.
To this it is replied on behalf of the Judge, that the statutes are unconstitutional — that the powers of courts over contempts areinherent, and that when the Courts exist by virtue of the Constitution, the inherent powers become constitutional provisions.
We admit, that there is in all courts an inherent power to preserve order, while discharging their business. This power is incidental to the office, inseparably attached to it, and cannot be taken away by legislative authority while the Court exists by virtue of the Constitution.
Every Judge invested with the power to hear and determine cases, must be endowed with all the powers, which, as Chief Justice *Page 275 
Nash says, "are necessary to the proper transaction of the business (358) before him." "If it were not in the power of the Court to punish individuals, who by noise or otherwise interrupt its proceedings, its business would be impeded, the majesty of the law defied and the Court ultimately brought into contempt."
Such powers as are clearly necessary for this purpose, are inherent. To deny them would annihilate Courts of justice. The judicial department exists by virtue of the Constitution, and stands upon the same base with the Legislative and Executive. The legislative department has the same constitutional power to destroy the judicial by the sword, as it has, by allowing a lawless mob to interrupt its officers in the discharge of their judicial functions.
It may sometimes be difficult to determine precisely where the line shall be drawn between the inherent powers of a Court, and those which are subjects of legislative regulations. That the common law recognized many acts as contempts, which are the subjects of legislative control, is manifest from the wide distinction drawn between Judges of Superior, and Judges of inferior Courts, in respect to language deemed contempts of the former, but not of the latter, and in no respect disturbing the official proceedings of either.
But the power of the legislature over contempts of Court, to the extent which Congress and this State have exercised it, must be conceded to be now settled too firmly to be upset. The Constitution of every State establishes the three great departments of government as independent of each other. Not one of these Constitutions expressly subjects the law regulating contempts of Court to the control of the legislature. They are all silent upon the subject. Yet the Legislature of every State has regulated contempts of Court, both in defining and punishing them, as this State and the United States have done; and the Constitutional power to do so has never been questioned.
A brief review of the legislation and decisions upon this subject is offered to illustrate and sustain our position. (359)
(1.) The act of Congress of 24th September, 1789, ch. 20, establishing the Judicial Courts of the United States, provides by sec. 17, that the Courts thereby established shall have power "to punish by fine or imprisonment all contempts of authority in any cause before the same, and to make and establish all necessary rules for the orderly conducting business in the said Courts, provided such rules are not repugnant to the laws of the United States."
The Courts thus created existed as fully by virtue of the 3d article of the Constitution of the United States as if they had been named *Page 276 
and created and their powers prescribed by that article. The powers over contempts, thus specially conferred, were declared by the Supreme Court of the United States (in U.S. v. Henderson and Goodwin, 7 Cr. 32-4,) to be necessary to the Court, and that they would have existed independently of the act of Congress.
It will be observed that none of the powers mentioned in the act, and by the Court declared to be necessary, extended to the case of a defamatory letter or speech about a Judge or Court, which did not disturb the order of the Court or obstruct it in the discharge of its business. The power as expressed was over "contempts of authority," and the usual and universal punishment, fine or imprisonment (and not striking from the rolls) had ever been the only punishment in England, was prescribed by the act of Congress.
(2.) In 1830 James H. Peck, a District Judge of the United States, undertook to punish the writer (over the signature of "a citizen,") of an article published in a newspaper, publicly calling attention to many supposed errors, as the writer alleged, in a judicial opinion of the Judge just before published by himself. The Judge, deeming the article disrespectful to him as a Judge, attached the editor of the paper to answer for contempt of Court. In the course of examination before Court Mr. Lawless, an attorney, avowed himself the author, whereupon (360) he was attached and sentenced to imprisonment and suspension from practice. Judge Peck was impeached for this before the Senate of the United States, and was acquitted by a vote of 22 against 21. Whether the acquittal was on the ground that he had exercised only the powers belonging to the Court, or because if he had transcended them he had done so without corrupt intent, does not appear. But in the course of the debate such vast and undefined powers of construing acts into contempt of Court were claimed in his defence as incidental to judicial authority, unless expressly limited by law, that Congress deemed it an imperative duty to pass the law of 2d March, 1831, entitled "An act declaratory of the law of contempts of Court."
The law was passed without dissent or further debate upon the subject, with an amendment defining and specifying the punishment as well as theacts of contempt.
(3.) It enacts "that the power of the several Courts of the United States to issue attachments and inflict summary punishments for contempts of Court shall not be construed to extend to any cases, except the misbehavior of any person or persons in the presence of the said Courts, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of the said Courts in their official *Page 277 
transactions, and the disobedience or resistance by any officer of the said Courts, party, juror, witness or any other person or persons to any lawful writ, process, order, rule, decree or command of the said Courts."
This law has existed unchanged for forty years, and for thirty-six years since the full and able judicial construction given to it in 1835, by Mr. Justice Baldwin, a very learned and distinguished Judge of the Supreme Court of the United States. It applies to the Supreme Court, as well as to the Circuit and District Courts of the United States; is cited as the law by Brightly in his digest of Federal Cases, and by Conkling in his "treatise," 16. Mr. Justice Baldwin, in ex partePoulson, 15, Haz. Pa. Reg. 380, says, "It is in the discretion of (361) the legislative power to confer upon Courts a summary jurisdiction to protect their suitors, or itself, by summary process, or to deny it; it has been thought proper to do the latter, in language too plain to doubt of the meaning of the law, or if it could be doubted by any ordinary rule of construction, the occasion and circumstances of its enactment would most effectually remove them."
"It would ill become any Court of the United States to make a struggle to retain any summary power, the exercise of which is manifestly contrary to the declared will of the legislative power * * *. Neither is it proper to arraign the wisdom or justice of a law to which a Court is bound to submit, nor to make an effort to move in relation to a matter when there is an insuperable bar to any efficient action."
"The law prohibits the issuing of an attachment, except in certain cases, of which the present is not one; it would therefore, be not only utterly useless, but place the court in a condition beneath contempt, to grant a rule to show cause why an attachment should not issue when an exhibition of the act of 1831, would show most conclusive cause. The Court is disarmed in relation to the press, it can neither protect itself or its suitors; libels may be published upon either, without stint."
(4.) In 1846, ch. 62, (Rev. Code, ch. 34, sec. 117,) an act was passed by this State entitled "An act concerning contempts of Court." This act hasits history as well as that of Congress. It was written by the late Geo. E. Badger, and was introduced into the Legislature by the late Judge Gilliam. The language of this act is almost identical with that of Congress. That of this State underwent a slight change of expression when revised in 1854, but none in meaning or force of language. Under the act of Congress, there has been one judicial opinion uniformly acquiesced in. Under that of this State there has been one also, made in 1855. Weaver v. Hamilton,47 N.C. 343. In this case the *Page 278 
(362) Court, composed of Nash, C.J., and Justices Pearson and Battle, through the Chief Justice, says, "The doctrine of contempts is regulated in this State by statute. Before the year 1846, they were undefined, and left very much to the discretion of the Court presiding."
"Under such circumstances, it is not at all to be wondered at that many acts were considered as contempt, and punished as such, which in the eyes of the public, were looked upon as harmless in themselves, but as exhibiting an arbitrary spirit in judicial offences."
"The necessity of this power, however, is felt and acknowledged by every one who values the independence of the judiciary or its wholesome action. If it were not in the power of the Court to punish individuals who, by noise or otherwise, interrupt its proceedings, its business would be impeded — the majesty of the law defined, and the Court ultimately brought into contempt."
"Needful, then, as the power to punish for contempt is to every Court, it is proper and right that the Courts should have, as far as possible, some sure guide to regulate their course."
"No well minded Judge desires to be burthened with discretionary powers — at least no further than is necessary to the proper transaction of business before him."
(5.) The act of Assembly of April 10, 1869, ch. 177, sec. 1, is, to all intents, the act of 1846, except by the addition in the former of sec. 7, relating to the publication of proceedings in Court.
4. It is certain that Judge Logan, had he been a Justice of the Supreme Court of the United States, would have been disarmed of all power to protect himself or the respect due to the authority of his Court from the effects of the alleged libel.
It is contended, however, that ex parte Moore, 63 N.C. 397, overrules this interpretation.
But it is insisted, on behalf of Mr. Schenck, that whatever of doubt might have existed upon the question, whether the act of 1869 (363) excluded his case from contempt of Court, none can exist since the act of 4th April, 1871.
This last act as to contempts of Court,
(1.) Expressly repeals every part of the common law which is not recognized in the provisions of the act of 1869;
(2.) Specifies and defines expressly or by reference to sec. 1 of that act every act of contempt which a Court can lawfully notice;
(3.) Confines Courts to the punishments prescribed in sec. 2 of the act of 1869, in an unmistakable manner; *Page 279 
(4.) Forbids expressly the disbar of an Attorney at Law, and depriving him of his license to practice, until after he may be convicted of, or mayconfess in open Court, some criminal offence, shewing "him to be unfit tobe trusted in the duties of his profession."
5. If there be any power in legislation over the doctrine of contempt we may now assume as certain.
(1.) That for a mere contempt of Court, which the Court itself may find and declare, the only punishment is fine or imprisonment, or both. This is the law of Congress also;
(2.) That no attorney shall be disbarred, except for some offence which he shall confess in open Court, or of which he shall be duly convicted according to course of law. The Court is forbidden to try the fact charged;
(3.) That the criminal offence thus ascertained shall be such an one as shall deprive him of a moral status, and "shall show him to be unfit to be trusted in the duties of his profession."
6. But if the foregoing objections to the sentence of Judge Logan were all out of the way there still remains one which cannot be removed. He deprived Mr. Schenck of his privilege or office to practice law, without giving him a day in Court, contrary to natural justice and the express inhibition of sec. 17, art. 1, of the State Constitution, thatno person ought to be deprived of his freehold, liberties or privileges,but by the law of the land. This sacred principle of liberty, the birthright, alike, of our English ancestors and ourselves, has been often proclaimed and enforced by the Courts of England, and (364) by those of our own and sister States, as the great shield of freedom.
"It is a principle never to be lost sight of, that no person should be deprived of his property or rights without notice and an opportunity of defending them. This right is guaranteed by the Constitution. Hence it is that no Court will give judgment against any person, unless such person have an opportunity of shewing cause against it. A judgment entered up otherwise would be a mere nullity." Hamilton v. Adams, 6 N.C. 161.
"That is not a law of the land which deprives a citizen of his office without trial." Hoke v. Henderson, 15 N.C. 1.
"The Constitution and laws of the country guarantee the right that no freeman shall be divested of a right by the judgment of a Court, unless he shall have been made a party to the proceeding in which the judgment shall be obtained." Armstrong v. Harshaw, 12 N.C. 87. *Page 280 
"It would violate one of the first principles of justice secured to us by the 10th (now 17th) section of our Bill of Rights, that any man should be condemned, in his person or property, without a hearing or an opportunity to be heard." Otey v. Rogers, 26 N.C. 534.
Before an Attorney can be struck from the rolls of Court "he must have notice of the charges against him, and an opportunity to make his defence."1 Cal. Rep. 188, ex parte Bradley, 7 Wall. 364. In re Pollard, 2 Eng. Priv. Coun. cases 106, (1868.)
Lord Coke, in Baggs' case, 11 Rep. 93, says, that if a citizen be removed from his office "without hearing him answer to what was objected, or that he was not reasonably warned, such removal is void and shall not bind the party, and such removal is against justice and right""because he who decides a case without hearing both parties, though his decision may be just, is himself unjust." 1 Bl. Com. 282. (365) "Attorneys and Counsellors hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the Court after opportunity to be heard has been afforded." Ex parte Garland, 4 Wall. 333.
7. The sentence expelling Mr. Schenck from the bar is that pronounced when the Judge first took action upon the subject; it is still in force, and is the only one ever passed. His subsequent proceeding, after notification to Mr. Schenck, was no revocation of the illegal sentence, but merely an affirmation that he would not disturb it. It stands now by virtue of its first entry, and therefore is void.
8. The letter of Mr. Schenck, though harsh and passionate, and manifesting a want of respect for Judge Logan, does not authorize a deprivation of his license as Attorney, even if the acts of 1869 and 1871 were silent on the question. By the rules of the common law there must be clear evidence of a want of moral status in the accused. Ex parteBrounsall, 2 Com. 489. Bagg's case, ante, Ex parte Brandley, 7 Wall. 364, 1 ch. Cr. Law 660. 1 Tidd 89. The King v. Southerton, 6 East. 143. Jerome's
case, Cr. ch. 74. Ex parte Stokes, 28 E.C.L. Rep. 303, and notes (ed. of 1856.) In re Wallace, 1 Eng. Priv. Com. cases 283. Ex parte Burr, 9 Wheat. 529.
9. In our view of the case, the Judge violated the Constitution and laws in the following particulars:
(1.) He assumed without any proof by affidavit or otherwise, that Mr. Schenck was the writer of the letter, contrary to the rule in 4 Bl. Com. 286, and uniformly recognized. Ex parte Burr, ante. In re Judson, 3 Bl. C.C. 148; 3 Atk. 219; 2 Str. 1068; 28 E.C.L. Rep. 154. *Page 281 
(2.) He assumed that it was written for publication, without any evidence to that effect.
(3.) He punished before trial or opportunity to be heard.
(4.) He punished for an assumed contempt of Court with a punishment not allowed for contempts, contrary to the Acts of 1869 and 1871, and equally forbidden by the common law. Ex parte (366)Bradley, ante. In re Wallace, 1 Priv. Com. cases ante.
(5.) He punished an act which was not the subject of punishment by him.
(6.) He imposed punishment upon Mr. Schenck without any conviction in due course of law, or confession by him in open Court, contrary to the plain letter and the manifest meaning of the act of April, 1871.
Courts of justice are established by the Constitution, and are invested with certain inherent powers, which are essential to their existence, and of which they cannot be deprived by the Legislature.
Their province is to construe existing laws and to administer justice, and they must necessarily have the power by summary remedies to preserve order during their sessions, control the action of their officers, and enforce their mandates and decrees.
If the Courts could be deprived by the Legislature of these powers, which are essential in the direct administration of justice, they would be destroyed for all efficient and useful purposes.
The Government is composed of three co-ordinate branches, and the Constitution wisely declares that, "The Legislative, Executive, and Supreme judicial powers of the government, ought to be forever separate and distinct from each other. The Constitution is the fundamental law of the State, and contains the principles on which the government is founded. It regulates the division of the sovereign powers, between the coordinate departments, and directs the manner in which they are to be exercised. Each department has appropriate functions; and each is in some degree, a check upon the others, so as to prevent hasty and improvident action.
If either department encroaches upon the inherent rights of the others, this wise equilibrium of power will be disturbed and (367) the several departments cannot operate together in harmony, and thus accomplish the objects of good government.
The Legislature as the law-making power, may within constitutional limits, prescribe rules by which the authority of the judiciary is to be *Page 282 
exercised. The Judiciary cannot pass upon the wisdom and policy of particular legislation; but they can declare an act of the Legislature to be unconstitutional. This power ought to be exercised with great caution, and in no case unless there is a plain violation of the fundamental laws of the State. To preserve harmony in the government, each department, while it is jealous of its own rights, ought to keep as far as possible in its own appropriate sphere. The common law power of the Courts upon the subject of contempts, has been restricted in this State by statute. Rev. Code, ch. 34, sec. 117. Acts of 1868-'9, ch. 177. The whole subject has recently been elaborately considered by this Court, and needs no further discussion.Moore, ex parte, 63 N.C. 397. Biggs, ex parte, 64 N.C. 202.
Since the discussion of these cases the Legislature has seen proper to impose other restrictions upon the discretion and power of the Courts, by the Acts, ratified the 4th day of April, 1871. The necessity and propriety of such acts may well be questioned, as unduly restricting the powers of the Courts for the efficient administration of justice. There were already sufficient safeguards against "judicial tyranny." A person under process of contempt, for an offence committed in the presence of the Court, or which tended to obstruct the administration of justice, was entitled to have the particulars of the offence spread upon the records of the Court.
If the offence alleged occurred out of the presence of the Court, and consisted of an act or statement, which the Judge regarded as libelous, and done with the intention of bringing the Court into contempt, the respondent might "try himself" upon his own affidavit; or he (368) might join issue as to the facts, and justify by showing the truth of the allegations, which the Court regarded as libelous, and for which he was held in contempt. If a Judge refused to perform his duty, or acted in defiance of established facts, he would not only meet the indignant condemnation of public opinion, but he would be answerable at the bar of the High Court of Impeachment. The recent act above referred to, does not take away any of the inherent powers of the Courts, which are absolutely essential in the administration of justice, and is not such an encroachment upon the rights of the judicial department of the government as to warrant us in declaring it to be unconstitutional and void.
It is a law of the land and ought to be observed. It is unnecessary for us to pass upon the facts involved in this matter.
The plea of the respondent was sufficient in law, and his Honor ought to have discharged the rule.
There was error. *Page 283 
Per curiam.
Order reversed and rule discharged.
Cited: Kane v. Haywood, 66 N.C. 31; In re Oldham, 89 N.C. 26; In reRobinson, 117 N.C. 537; In re Gorham, 129 N.C. 487; Ex parte McCown,139 N.C. 104; In re Application for License, 143 N.C. 9; In re Ebbs,150 N.C. 51, 57; In re Brown, 168 N.C. 423; S. v. Johnson,171 N.C. 801; McLean v. Johnson, 174 N.C. 348; S. v. Little,175 N.C. 745; In re Parker, 177 N.C. 468; In re Parker,209 N.C. 695; S. v. Lawrence, 213 N.C. 681; Roller v. Allen,245 N.C. 525.
(369)