STATE v. N. L. LAWRENCE.

(Filed 15 June, 1938.)

**1. Criminal Law § 68a—**

The State may appeal from a judgment of not guilty rendered on a special verdict. N. C. Code, 4649.

**2. Constitutional Law § 8: Photographers § 1—Legislature, in exercise of police power, may regulate practice of photography.**

The practice of photography requires the exercise of skill, and the occupation involves certain fire hazards and is susceptible to fraudulent acts on the part of dishonest photographers in faking photographs, and since photographs are widely used in evidence and in advertising, and inaccurate photographs may be the subject of damage suits, the General Assembly may, within the constitutional limitations, provide for the regulation and licensing of photographers in the interest of the public welfare in the exercise of the police power, to the end that only those photographers possessing the required degree of skill and moral character may be licensed.

**3. Constitutional Law § 8—**

What professions and occupations should be subject to regulation in the exercise of the police power is largely in the discretion of the Legislature.

**4. Constitutional Law § 6b—**

A statute will not be declared unconstitutional unless it so clearly violates a constitutional provision that no reasonable doubt can arise.

**5. Constitutional Law §§ 12, 15a—Act regulating practice of photography does not create monopoly nor violate due process clause.**

Ch. 155, Public Laws of 1935 (N. C. Code, 7007 [1] to [29]), providing for regulating and licensing photographers, sets up sufficiently definite standards of competency, ability and integrity, and requires the licensing board to issue licenses to all applicants who meet these qualifications without discrimination, an applicant having recourse at law for any arbitrary acts of the board, and the statute does not violate due process of law, sec. 1, Fourteenth Amendment of the Federal Constitution, Art. I, sec. 17, of the Constitution of North Carolina, nor deprive any person of fundamental, inalienable rights, Art. I, secs. 17 and 29, nor create a monopoly in contravention of Art. I, sec. 31, of the State Constitution.

**6. Same—Act providing for regulation and licensing of photographers does not set up arbitrary standards for examining applicants.**

> N. C. Code, 7007 (11), providing that the board of examiners may require proofs as to the business record of an applicant for photographer's license does not set up an unconstitutional method of ascertaining the qualifications of an applicant, the "business record" not being of itself a test to be applied by the board, but being merely a suggested source which the board may consider in determining the applicant's competency, ability and integrity.

BARNHILL, J., dissenting.

SEAWELL, J., concurs in dissent.

APPEAL by the State from *Phillips, J.,* on special verdict, at January Term, 1938, of FORSYTH. Reversed.

The defendant was indicted for violating the "Photography Act."

The important provisions of chapter 155, Public Laws 1935, "An act to regulate and control the practice of photography." N. C. Code, 1935 (Michie), sections 7007 (1)-(29).

Section 7007 (1) contains definitions.

Section 7007 (2) provides for the establishment of a State Board of Photographic Examiners to be appointed by the Governor. Subsequent sections provide for its organization, hearings, rules and public record of its proceedings.

Section 7007 (10), "The board shall provide for the examination of applicants who desire to practice photography in this State . . . and issue certificates of registration and licenses to practice photography to anyone who shall qualify as to *competency, ability and integrity.*" Provision is made for temporary certificates until the next examination.

Section 7007 (11) provides that as a prerequisite to examination the board shall have the power to require proofs as to "technical qualifications, business record and moral character of such applicant."

Section 7007 (13) provides for applications upon forms prescribed by the board and examination fees. "All applicants must appear for examination at the time and place designated by the board and shall present such references and credentials as the board may require and shall give satisfactory evidence as to their competency and fitness to conduct the practice of photography based on their technical knowledge, their business record and their moral character."

Section 7007 (17)—Licenses are not transferable and may not be issued to any person, firm or corporation doing business under an assumed or fictitious name.

Section 7007 (18)—Photographers who have been continuously engaged in the practice of photography and/or photo-finishing in North Carolina for one year next preceding the passage of the act are entitled to a license upon application without examination upon the payment of a specified fee.

Section 7007 (19) provides for annual license fees ($5.00 in the case of a photographer having an established place of business and $3.00 in the case of employees of established places of business).

Section 7007 (20) prohibits the sale or solicitation of orders for photographic products except by registered license photographers.

Section 7007 (23) provides for the revocation of licenses upon the following grounds: (a) Failure to pay annual license, with liberal provisions for reinstatement; (b) fraud or unethical practices, willful misrepresentation, or upon being found guilty under the laws of North Carolina of any crime involving moral turpitude. Provision is made for notice to accused photographer of charges, which charges must be filed in writing and under oath with the board, representation by counsel, public hearing, attendance of witnesses and stenographic report of proceedings, which shall constitute a record of the board, with provision for an appeal to the Superior Court.

Section 7007 (24)—Violation of the provisions of this chapter is made a misdemeanor and certain fine and imprisonment imposed.

Section 7007 (28)—Exemptions: (a) Newspaper photographers not otherwise selling photographs. (b) Photographs made for experimental purposes or for personal use and pleasure and not sold. (c) Photographs made by employees of State and Federal governments and their political subdivisions or by schools, colleges, universities or other State institutions making photographs for public use in connection therewith and not selling such photographs. (d) Medical practitioners, hospitals, or other institutions making photographs for clinical, surgical or medical purposes. (e) Motion picture photographers.

Section 7007 (29)—The act is made applicable only to cities and towns having a population of more than twenty-five hundred. Photographers whose products retail at unit price of not more than ten cents are exempted.

The State contends that the special verdict establishes all necessary facts to support a verdict of guilty, to wit, practice by the defendant of still commercial portrait photography and photography in other branches without applying for or securing a license and the selling of such products in Winston-Salem, a city of more than 75,000 persons, at unit prices in excess of ten cents per picture by the use of coupons.

The special verdict was as follows:

"In the Superior Court, 10 January Term, 1938.

"The jury, for its verdict, finds: That N. L. Lawrence, a resident of Forsyth County, North Carolina, on or about 16 April, 1937, at and in the county of Forsyth, North Carolina, and within the corporate limits of the city of Winston-Salem, a city at that time having a population in excess of 75,000 persons, did engage in the general business of portrait

photography and did practice general portrait photography and photography in other branches; that is to say, did engage in the profession, occupation or avocation of taking and producing still portrait photographs for hire and profit and selling the same in the State of North Carolina, at unit prices in excess of ten cents per picture, without first having obtained a license to practice photography from the State Board of Photographic Examiners and without being duly licensed and registered by said State Board of Photographic Examiners to practice photography in the State of North Carolina, and without first having filed an application with the State Board for a license to practice photography and without having practiced photography or photo-finishing continuously in the State of North Carolina for one year next preceding the enactment of chapter 155 of the Public Laws of 1935; that the defendant, in the practice of photography, from time to time has issued and sold coupons; that the defendant has paid the State and local license taxes required and authorized by the Revenue Act. If, upon the foregoing facts the court be of the opinion that the defendant is guilty, the jury so finds; otherwise, it finds him not guilty. The court being of the opinion that the defendant is not guilty, the jury so finds not guilty for its verdict. F. Donald Phillips, Judge Presiding."

The State excepted, assigned error to the judgment as signed, and appealed to the Supreme Court.

*Attorney-General McMullan, Manly, Hendren & Womble, and W. P. Sandridge, amicus curiæ for the State.*
*Parrish & Deal for defendant.*

CLARKSON, J. N. C. Code, 1935 (Michie), section 4649, is as follows: "An appeal to the Supreme Court may be taken by the State in the following cases; and no other: Where judgment has been given for the defendant—(1) Upon a special verdict. (2) Upon a demurrer. (3) Upon a motion to quash. (4) Upon arrest of judgment."

The sole question presented on this appeal: Is chapter 155 of the Public Laws of 1935 (N. C. Code, *supra,* section 7007 [1]-[29])—"An act to regulate and control the practice of photography"—constitutional? We think so.

The defendant contends that this statute providing for the regulation and licensing of photographers in North Carolina is unconstitutional and void: In that it violates the Constitution of the United States, Fourteenth Amendment, section 1, which provides: ". . . nor shall any state deprive any person of life, liberty, or property, without due process of law," etc. Also that it violates the following provisions of the Constitution of North Carolina: Article I, section 1: "That we hold

it to be self-evident that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." Article I, section 17: "No person ought to be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property, but by the law of the land." Article I, section 29: "A frequent recurrence to the fundamental principles is absolutely necessary to preserve the blessings of liberty." Article I, section 31: "Perpetuities and monopolies are contrary to the genius of a free state and ought not to be allowed." We cannot so hold.

In *S. v. Warren*, 211 N. C., 75 (79), the act was not a general State act and was declared unconstitutional. This Court in that case said: "The State can, no doubt, in a State-wide act, make reasonable regulations in regard to the real estate business."

The following are some of the professions and occupations regulated in a similar manner by the statutes of this State: Doctors, lawyers, accountants, contractors, pilots, pharmacists, osteopaths, trained nurses, chiropodists, veterinarians, dentists, architects, barbers, cosmetologists or beauticians, engineers, optometrists, chiropractics, embalmers, real estate brokers and salesmen, midwives.

It goes without saying that photography requires skill. It involves, of course, the use of chemicals, celluloid and other combustible materials and there is a certain fire hazard involved. Photographs, photostats and other means of reproducing likenesses are in general use. They are used every day in the courts to illustrate sworn testimony. Photographs are especially used in railroad and automobile accident cases. The detection of forgeries and altered instruments, finger printing, and kindred matters are accomplished by photography. Such photographs greatly enlarged are frequently used as evidence in the courts. Photographs are commonly used in advertising as taking the place of samples and, therefore, dishonest photographs can lend themselves to the perpetration of fraud. Fake photography and careless and inaccurate photography have been the subject of damage suits. Photography in newspapers and magazines is now used as never before.

In 6 Ruling Case Law, part sec. 199 (Constitutional Law), p. 203 *et seq.*, is the following: "However difficult it may be to render a satisfactory definition of 'police power,' there seems to be no doubt that it extends to the protection of the lives, health, and property of the citizens, and to the preservation of good order and the public morals, to the restraint and punishment of crime, and to preservation of the general welfare of the community. Various phrases are used to describe the matters in reference to which it may be exercised. It has been frequently said that it extends to a protection of the public health, safety

and morals, to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the state, and likewise to the promotion of the comfort and welfare of society, and to the enhancement of the public convenience and the general prosperity. It has therefore been stated that, as a general principle, legislation is valid which has for its object the promotion of the public health, safety, morals, convenience, or general welfare, or the prevention of fraud, immorality, or oppression. It has also been said that the police power includes the right of the state to prescribe regulations for the good order, peace, protection, comfort, and convenience of the community, for the preservation of good order and the public morals, the promotion of domestic tranquillity, and the comfort and quiet of all persons; and in general that it extends to the enactment of all such wholesome and reasonable laws, not in conflict with the constitution of the state or the United States, as they may deem conducive to the public good." 11 Amer. Jur., pp. 1027, 1044.

The matter of police power has been thoroughly discussed in many decisions in this State in reference to professions and occupations.

In *S. v. Call,* 121 N. C., 643 (646), it was said: "It is not to be questioned that the law-making power of a state has the right to require an examination and certificate as to the competency of persons desiring to practice law or medicine (citing authorities); to teach, to be druggists, pilots, engineers or exercise other callings, whether skilled trades or professions, affecting the public and which require skill and proficiency (citing authorities). To require this is an exercise of the police power for the protection of the public against incompetents and impostors, and is in no sense the creation of a monopoly or special privilege. The door stands open to all who possess the requisite age and good character and can pass the examination which is exacted of all applicants alike."

In *S. v. Lockey,* 198 N. C., 551 (556)—(Barber Act)—we said: "The police power is elastic, stretching out to meet the progress of the age."

The matter is largely in the discretion of the General Assembly as to what professions and occupations are within the police power of the State and subject to regulation. Of course, due regard must always be had to the provisions of the Constitution of the United States, 14th Amendment, sec. 1, and Constitution of North Carolina, Art. I, sec. 8, and the other provisions before mentioned.

It is equally well settled that no act of the General Assembly ought to be declared violative of any constitutional provision unless the conflict is so clear that no reasonable doubt can arise. *Coble v. Comrs.,* 184 N. C., 342; *Gunter v. Sanford,* 186 N. C., 452; *S. v. Yarboro,* 194 N. C., 498; *Plott v. Ferguson,* 202 N. C., 446; *Glenn v. Board of Education,* 210 N. C., 525.

The act provides that the board shall issue certificates and licenses "to anyone who shall qualify as to *competency, ability and integrity.*" Section 7007 (10). These are laudable standards. They are not too vague and indefinite. Competency and ability are required to guard against imposition of an unskilled photographer upon the public which we think is a proper object for the exertion of the police power. Integrity is required to guard against fraud, unethical dealings and sharp practices. The board is required to issue licenses to all applicants who meet these qualifications. It is true that the board is left with discretion to determine competency and ability (by examination—written, oral or practical), and integrity (by furnishing proofs, section 7007 [11]). Proofs are required of lawyers seeking an examination. Particular objection was levied to the reference in the act to the "business record" of applicants, referred to in section 7007 (13). As we read this section, *business record is not of itself a test to be applied by the board,* but it is a suggested source from which the board may determine the integrity, competency and ability of an applicant. The business record of a photographer is some evidence, or at least a proper subject for the board to consider in applying the three standards enumerated by the Legislature : (1) Competency. (2) Ability. (3) Integrity. The door is open to any applicant possessing these qualifications. Of course, it is true that the Board of Photographic Examiners may conceivedly act arbitrarily in a given case, but so may the Board of Law Examiners, or anyone of the other numerous boards established by the General Assembly. The law furnishes redress in such a case.

In *S. v. Lockey, supra,* p. 554, we find : "The defendant contends that the General Assembly had no authority to create an expense and arbitrarily and unreasonably classify the citizens and taxpayers of the State and unjustly place the whole burden upon a few thousand of a particular class—the barbers. He further contends that the act makes a further arbitrary and unreasonable classification among the barbers themselves in making the act applicable to towns of 2,000 or more population. We think the act constitutional and not arbitrary." *Roach v. Durham,* 204 N. C., 587 (592).

Taking the entire act and considering it as a whole, we cannot hold it unconstitutional. We cannot say that it is arbitrary, or unreasonable or an unconstitutional delegation of legislative authority. We think the conclusion in the brief of the State correct : "It is submitted that the Legislature of North Carolina is the proper division of the State's government to determine in the first instance the need of regulating a given occupation. The Legislature has determined upon good and sufficient ground . . . that it is in the public interest to regulate the licensing and practice of photography. Such regulation falls within the

letter, *S. v. Call, supra,* and the spirit of the police power, and further that the act contains proper standards of classification, is not arbitrary and should be upheld."

For the reasons given, the judgment of the court below is

Reversed.

BARNHILL, J., dissenting: Does the General Assembly have power to create an administrative agency with power to deprive a citizen of the right to practice one of the ordinary and usual trades, such as commercial photography? The majority view answers this question in the affirmative. From this result I am compelled to dissent, as I do not find the reasoning of the majority opinion convincing either as to the present state of the law on the subject or as to the social utility and desirability of the legal theory there propounded.

The decision of the Court is predicated largely upon the doctrines of *S. v. Warren,* 211 N. C., 75; *Roach v. Durham,* 204 N. C., 587; and *S. v. Lockey,* 198 N. C., 551. The former declared unconstitutional a local law seeking to regulate real estate brokers in contravention of a State-wide, revenue, licensing act applicable to such brokers; although *dicta* in that opinion indicate that such a State-wide act would be upheld, the Court there expressly declined to pass upon the question. The *Warren case, supra,* is, therefore, authority only for what it holds, nothing more. The *Roach case, supra,* upheld a State-wide plumbers licensing act as a constitutional effort to promote the "health, comfort and safety of the people." The *Lockey case, supra,* upheld the State-wide barbers licensing act as a valid exercise of the police power "in the protection of the health of the public." The soundness of the *Roach* and *Lockey cases, supra,* is beyond question, as the acts considered in both of these cases bore directly upon the protection of public health, a matter clearly constituting a valid exercise of the police power. However, neither of these cases constitutes authority permitting the General Assembly by administrative licensing to deprive a tradesman or workman of the right to exercise a usual and ordinary trade or calling.

The constitutional limits of the power of the General Assembly to regulate vocations through licensing has heretofore been limited strictly to the professions, with the possible exception of barbering, in which case the protection of the public health was so obviously involved. Regulation by licensing of the practice of medicine and surgery (*S. v. Van Doran,* 109 N. C., 864; *S. v. Call,* 121 N. C., 643), of dentistry (*S. v. Hicks,* 143 N. C., 689), of osteopathy, chiropractic, and suggesto-theraphy (*S. v. Siler,* 169 N. C., 315), and of accounting (*S. v. Scott,* 182 N. C., 865), has been approved as constitutional. The power of the General Assembly to indicate qualifications of attorneys has long been recognized (*Ex parte Schenck,* 65 N. C., 353; *Kane v. Haywood,*

66 N. C., 1; *In re Applicants for License,* 143 N. C., 1), but the question as to the constitutionality of the State Bar Licensing Act has not yet been passed upon (see *In re Parker,* 209 N. C., 693; *In re West,* 212 N. C., 189). With the exception of barbering, all of these vocations whose regulation has been upheld are distinctly professional in nature, are achieved only after thorough schooling, involve a peculiarly personal trust relationship to their clientele, and imply necessarily a distinct reliance upon the individual knowledge, judgment and skill of the practitioner. | The regulation of business and professions through administrative licensing has heretofore been limited to those professions having a direct and positive relation to the health, safety, or morals of the community. The trade of photography bears no genuine resemblance to any of the professions indicated; nor can it be considered on a parity with barbering, since the normal and usual practice of the trade has no necessary relationship to either health, safety, or morals. Granted that a careless use of chemicals might endanger health, that a blundering and ignorant use of the dark-room might cause a serious fire, and that a venal photographer might specialize in the production and sale of fraudulent or obscene photographs, these are exceptional *instances* and abuses of power and are no more inherent in the trade of photography than in any other usual and ordinary calling or occupation. . . ,

The limits heretofore recognized with respect to the regulation of business by administrative licensing were not accidental. In *S. v. Lockey,* 198 N. C., at p. 558, *Clarkson, J.,* cites with approval the words of *Sutherland, J.,* in *Liggett Co. v. Baldrige,* 278 U. S., 105, 111-112, as follows, "The police power may be exerted in the form of state legislation where otherwise the effect may be to invade rights guaranteed by the Fourteenth Amendment (in this case his business as a property right) only when such legislation bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare." In the same case, at p. 113, *Sutherland, J.,* continued, "A state cannot, 'under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.' *Burns Baking Co. v. Bryan,* 264 U. S., 504, 513, 44 S. Ct., 412, 413 (68 L. Ed., 813, 32 A. L. R., 661). See, also—(citing many U. S. Supreme Court cases)." Likewise, in *S. v. Warren,* 211 N. C., 75, the limitation on the exercise of the police power was recognized in the following quotations, there quoted with approval, "In *Rawls v. Jenkins,* 212 Ky., 287 (279 S. W., 350), at p. 292, it is said, 'If occasional opportunity for fraud is to be the test, then there is no reason why every grocer, every merchant, every automobile dealer, every keeper of a garage, every manufacturer, and every mechanic who deals more frequently with the public in general, and whose opportunities for fraud are far greater than those of the real

estate agent or salesman, may not be put on the same basis.   If that be
done, then only those who, in the opinion of certain boards or the courts,
have the necessary moral qualifications will be permitted to engage in
the ordinary occupations of life.   The result will be that all others who
fail to establish their moral fitness will not only be deprived of their
means of livelihood, but will become a burden either on their families
and friends or the community at large.   In our opinion, the right to
earn one's daily bread cannot be made to hang on so narrow a thread.
Broad as is the police power, its limit is exceeded when the state under-
takes to require moral qualifications of one who wishes to engage or
continue in a business which, as usually conducted, is no more dangerous
to the public than any other ordinary occupation of life.   As said of the
real estate agent in *Hager, State Auditor, v. Walker,* 128 Ky., 1, 107
S. W., 254, 15 L. R. A. (N. S.), 195, 129 Am. St. Rep., 238: 'The
occupation taxed is essentially a harmless one.   It has none of the
features requiring police regulation, and there is no reason why the
police power should be invoked concerning it.' "   What is there said
concerning real estate agents and salesmen is equally applicable here to
photographers.

The right to license upon examination necessarily implies the power
to exclude by refusing to grant such license.   The power to exclude men
from the ordinary and usual trades and callings common to all com-
munities is the power to deprive men of the right to earn an honest
livelihood. ' The right to earn a livelihood is "fundamental, natural,
inherent and inalienable, and is one of the most sacred and most valu-
able rights of a citizen.   A person's business occupation or calling is
'property' within the meaning of the constitutional provisions as to due
process of law and is also included in the right to liberty and the pur-
suit of happiness.   The right of a person to pursue a calling consistent
with proper and reasonable police regulations which the particular
situation may sanction, cannot be taken away by legislative enactment.
The common businesses and callings of life, the ordinary trades and
pursuits which are innocent in themselves and which have been fol-
lowed in all communities from time immemorial, must, therefore, be free
in the United States to all alike upon the same terms. . . . More-
over, it has been held that the right to choose one's occupation includes
the right to be free from unlawful interference or control in the conduct
of it."   11 Am. Jur., "Constitutional Law," s. 336.   The discretionary
power to control admission to an ordinary trade or calling has never
existed in the General Assembly.   "Regulation of occupations cannot
be valid where it amounts to an arbitrary or unwarranted interference
with the right of the citizen to pursue any lawful business.   It is de-
pendent upon a reasonable necessity for its exercise to protect the health,
safety, morals or general welfare of the state, and unless an act restrict-

ing the ordinary occupations of life can be shown to fall within these objects of the police power, the act is void. If a lawful business is of a beneficial character, and not dangerous to the public, either directly or indirectly, it cannot be subjected to any police regulation whatever. . . . Such pursuits as agriculture, merchandise, manufacturing, and industrial trades cannot be dealt with at will by the Legislature. As to them the power of regulation is comparatively slight when they are conducted and carried on upon private property and with private means." 11 Am. Jur., "Constitutional Law," ss. 285-286. "The right of a citizen to pursue any of the ordinary vocations on his own property and with his own means, can neither be denied nor unduly abridged by the Legislature, for the preservation of such right is the principle purpose of the Constitution itself. In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised, unless the business is of such character as places it within the category of social and economic ills." Quoted with approval in 2 Cooley's Constitutional Limitations, 8th Ed., p. 1329, from *Ex Parte Dickey,* 76 W. Va., 576, 85 S. E., 781, L. R. A., 1915-F, 840.

This photographers licensing act can only be justified, if at all, as a valid exercise of the police power. As Willis has so accurately stated, "There are two main requirements of a proper exercise of the police power: (1) There must be a social interest to be protected which is more important than the social interest in personal liberty, and (2) there must be, as a means for the accomplishment of this end, something which bears a substantial relation thereto." Constitutional Law, p. 728. This is essentially class legislation put forward by a particular group of tradesmen to the end that those now within the trade may limit newcomers seeking to enter the field of their livelihood. The advocates of the measure insist that its approval will necessarily make available to the public more skilled and more honest photographers. In return for this vague promise of greater public service the established photographers will be given a virtual monopoly of the trade and with it such incidentals as the power to control prices and the character of their services. The "social interest" which this law would tend to protect is a very general one, so evanescent in its characteristics as to belong in the realm of metaphysics and psychic phenomena. On the other hand, the very real and positive benefits to the particular group at the expense of the loss of liberty of citizens generally is quite tangible. In order that a trade guild with state-granted powers of exclusion be established, a serious and dangerous abridgement of one of the most precious rights of American citizens—the right to earn a livelihood—is advocated.

Written into our organic law is a strong repulsion for special privileges and monopolies. In our Bill of Rights we find, "No man or set of men are entitled to exclusive or separate emoluments or privileges

from the community but in consideration of public service," reinforced by the principle that "perpetuities and monopolies are contrary to the genius of a free state and ought not be allowed." N. C. Constitution, Art. I, ss. 7, 31. Our legal tradition in dealing with business and trade has been marked by an effort to encourage free enterprise, free alike from domination by government and monopoly. Our working theory has been that under a competitive economic system, prices, the quality of the product, and the type of service rendered will be sufficiently determined by the forces of free competition. By and large, the uncontrolled market place has proven itself a fair arbiter which has encouraged initiative and stimulated the sale of the best pecuniary values. The task of government has been largely that of an umpire whose duty it was to assure the free play of effective, open competition. Except in those businesses and professions marked peculiarly with some social interest or public service, experience has shown that a very limited interference with business is socially desirable.

Old truths are valuable ballast and the experienced mariner does not cast them overboard at the first suggestion of some passenger new to the ways of the sea. In our rapidly changing social and economic life it may become necessary to advance the banner of the police power into new and as yet unknown territory, but I am convinced that the instant case is not one demanding that the old and recognized boundaries of the police power be ignored. Almost every trade and calling is tinged with some element of social interest or public service, for if the work has no social utility it rarely survives. However, few trades or callings are so essentially vested with a social interest as to justify their establishment, by legislative grant, as close-knit, self-governing, trade monopolies having the power to exclude those seeking to compete with veterans of the craft. The life of our society is not yet so thoroughly regimented that the right to work and earn an honest living in the trade of one's choice is dependent upon the approval of some bureau, commission, or examining board, itself interested perhaps in excluding new workers from its own crowded vineyard. Nor am I yet convinced that it would be better so. The view of the majority in this case, in my opinion, goes well beyond the previously approved limits of the valid exercise of the police power in this State.

While photography requires some skill, it is the same type of skill required by other trades and vocations. Such danger as arises from the use of chemicals, celluloid and other combustible materials, is to the individual and not to the public as a whole. The fire hazard, if any, is not near so great as that resulting from the operation of dry cleaning plants, gasoline stations and other ordinary trades. Photographs, it is true, are used in evidence. However, as stated in the majority opinion, they are used only to illustrate sworn testimony. They are not admis-

sible in evidence until or unless some witness has first sworn that they correctly represent the objects or conditions they purport to portray. If there is perjury it arises out of the testimony of the witness and not out of the use of the photograph. The photograph merely makes more intelligible to the jury the evidence of the witness.

There are those lacking in moral character connected with all trades and callings. Good morals cannot be created by legislation. The mere fact that some who are photographers have an opportunity to perpetrate frauds is not unusual. The quality of a photograph can more easily be detected by the lay public than can the quality of cloth or other articles of merchandise, particularly when such merchandise is of a mechanical composition, such as watches and automobiles. I am, therefore, unable to conceive how the practice of photography has such a rational and substantial relationship to social needs or to public health, safety and good morals as to make it a subject of legislation under the police power of the State.

SEAWELL, J., concurs in dissenting opinion.